No. 12,965.

## Succession of Mrs. Louisa J. Bidwell.

### Syllabus.

An attack made upon a will on the ground of incapacity of the legatees to receive the benefit of bequests therein made because they are the wife and children of the doctor who professionally attended the testatrix during the sickness of which she died and are therefore reputed to have been interposed for him, can not be sustained in the absence of satisfactory evidence being administered that the same was made during that sickness.

APPEAL from the Civil District Court, Parish of Orleans—*Monroe, J.*

---

*Edgar M. Cahn* and *E. J. Meral* for Plaintiffs, Appelants.

---

*James McConnel, Jr.,* for Defendants, Appellees.

---

The opinion of the court was delivered by

WATKINS, J. This action was brought by certain persons who allege themselves to be the only collateral relations and legal heirs of the de-

ceased, to annul her last will and testament, on the ground that the heirs whom she instituted were legally incapacitated to take the be-. quests therein provided.

The alleged incapacity of the instituted heirs is based upon the precepts of the Civil Code, notwithstand.ng the determination of the issue involved, rests, exclusively, upon a question of fact.

On the trial of the cause, there was judgment rendered rejecting the plaintiffs' demands, and they have appealed.

On the 4th of June, 1890, Mrs. Louisa J. Bidwell made her last will, nuncupative in form and evidenced same by a public act; and she therein bequeathed to Mrs. Louise Moore Pratt, one pair of solitaire diamond earrings, and the residue of her property to the children of George K. Pratt and Mary Louise Moore Pratt, his wife, and appointed George K. Pratt testamentary executor, and dispensed him from giving bond. The will is attacked by Isabella Pamelia Babcock, and Agnes Emily Babcock, who allege themselves to be nieces and nearest of kin of the deceased testatrix, on the ground that Dr. George K. Pratt, who is named as executor, is the husband of one of the legatees, and the father of the other legatees; that he was and is a doctor of physic or medicine, and as such, attended the deceased, in his said professional capacity, during the sickness of which she died; that the will was made during the sickness of which she died, and his wife and children are incapable of receiving any bequest therein, as the law presumes that they were interposed for their husband and father, and that the legacies in their favor are, therefore, absolutely null, and should be so decreed; and that they should be recognized as her heirs at law, and as such, placed in possession of her estate.

It is conceded that Dr. George K. Pratt is and was, at the date of the execution of the will of the deceased, and at the date of her death, a practicing physician, and in that capacity, professionally attended her at those dates, and that he so attended her at various times intermediately between those dates.

It is further conceded, that Dr. George K. Pratt sustains the relation of husband to one of the legatees, and that of father to the other legatees; and also, that the plaintiffs are nieces of the deceased, and her nearest of kin, and her legal heirs if her will should be avoided.

The incapacity of the legatees is claimed to arise under the following provision of law, viz:

"Doctors of physic, or surgeons, who have professionally attended a
" person during the sickness of which he dies, cannot receive any ben-
" efit from donations *inter vivos* or *mortis causa,* made in their favor
" by the sick person during that sickness, etc." R. C. C., 1489.

"Every disposition made in favor of a person incapable of receiving,
" shall be null and void, whether it be disguised under the form of an
" onerous contract, or be made under the name of persons interposed.

"The father and mother, the children and descendants, and the hus-
" band of the wife, shall be reputed persons interposed." R. C. C.,
1491.

In view of the concessions that are made by the defendants' coun-
sel, the applicability of the foregoing provisions of the Code is so clear
and undoubted, that there is no controversy on that score; and this
being the case, the only open question open for discussion is one of
fact, whether the decedent's will was made during the sickness of
which she died.

The will having been made on the 4th of June, 1890, and the dece-
dent's death having occurred on the 16th of May, 1897, and several
years having intervened between those two events, the contention of
the plaintiffs is, that for a great number of years previous to the mak-
ing of the will, and continuously thereafter, up to the time of her
death, she suffered from heart disease, which resulted in her death,
and consequently she made the same during the sickness of which she
died; whilst that of the defendants is, that she was taken sick on the
17th of March, 1897, and her sickness continued until the 16th of May
following, when she died—the sickness of which she died having been
certified by the attending physician to have been phlebitis and heart
disease.

Consequently, the propositions to which our attention must be di-
rected are (1) whether Mrs. Bidwell was afflicted with heart disease
during the period of time mentioned, and, if so, to what extent; (2)
whether heart disease is, speaking scientifically, a predisposing cause
of phlebitis, and if so, whether the evidence discloses that, as a matter
of fact, it originated the attack of which the attending physician cer-
tified she died.

We think it may be safely assumed, from the general trend of the
testimony of lay witnesses, that Mrs. Bidwell was a sufferer from a
heart trouble of some kind for many years prior to the execution of
her will, and for many years thereafter, and up to the date of her

death; and that there is none of it which contradicts the statement of the attending physician that her death resulted from phlebitis, and which, in his opinion, was superinduced by a relapse from an attack of the grippe—same extending to the heart and producing endocarditis.

Our learned brother of the district court, in assigning his reasons for judgment, made the following statement, viz:

"It is established, beyond doubt, that the deceased had some affection " of the heart before and after the date of making the will, and that " she continued to be so affected up to within twelve months of her " death, when Dr. Pratt called the attention of Dr. Washington to the " abnormal action of her heart; and I think it may fairly be deduced " from the testimony, that the same abnormal condition existed at the " time of her death."

But, notwithstanding this expression of opinion predicated upon the testimony, he was convinced that sufficient evidence had not been adduced to show that the heart affection of the deceased produced the phlebitis of which it is claimed she died; or, in other words, it was not proven, to the satisfaction of the judge, to have been *the* predisposing cause thereof.

With reference to the decedent's heart affection, there were various witnesses interrogated at the trial—non-professional persons—and they related a great number and variety of details and circumstances tending to show that she had been, for a number of years, afflicted with heart affection of some kind.

One of those witnesses states that she complained of heart-failure frequently, and that on those occasions she always summoned Dr. Pratt, and he attended her professionally. That on these occasions, she told the witness that the doctor said she had "a heart trouble."

Another witness states that in 1881, and subsequently, she frequently complained of having "heart disease"; and that on those occasions she had Dr. Pratt summoned.

That in 1891 she had a sudden and severe attack of heart disease for which Dr. Pratt treated her.

Another witness relates similar occurrences as having taken place in 1890, the year in which she made the will; another in 1895; and another as long ago as 1878.

Another witness states that for several years previous to her death, he knew her very intimately, and that she frequently complained of

her heart, and told him that she had heart disease. That Dr. Pratt had informed her that "she might go off like a flash." That on several occasions he went to see Dr. Pratt, at her request, and that he administered medicine to her for that complaint, in his presence. That on one of these occasions Dr. Pratt said that Mrs. Bidwell had been afflicted with heart disease for many years.

That, on the 10th of May, 1897, one week previous to her death, he went to Dr. Pratt, at the request of the deceased, to tell him that she complained of her heart, and wanted something to relieve her of it. He states that she complained of her heart troubling her up to the time of her death; and his statement is corroborated by another witness who waited upon the deceased during the last two weeks of her life.

One practitioner of medicine gave his testimony on behalf of the plaintiffs, and his statement is, that he was called to see Mrs. Bidwell professionally, during the time she resided at Pass Christian, Mississippi, in the latter part of the year 1892, and that upon an examination he ascertained that she had some heart trouble. That on a subsequent occasion he made an examination of her heart with a stethoscope, and found her heart beat irregular, and an intermittency in the pulse-beat, and some regurgitation of the blood; that is to say the "valves of " her heart did not open and close properly—the doors of the ventricle " of the heart, the valves of the heart, in the left side of the heart."

He gave it as his opinion that it was an old chronic trouble of long standing. He states that the deceased had similar attacks in 1894 and 1895, the effect of which was a complete prostration and confinement to bed; and that "he used nitro-glycerine, or something like that, to relieve her." That these attacks were "serious, even dangerous"; but when tided over "the patient would get along very well until another attack came on. That those attacks were sudden, but passed away rapidly."

That in his opinion, her disease was a permanent and incurable one; and feeling that he could not cure her, he recommended her to see a heart specialist.

Yet, there were several witnesses who testified, that for several years previous to her death, the deceased appeared to be active and vigorous, and in apparently good health, and gave considerable attention to her private affairs, and matters of business.

Subsequent to her husband's death, decedent was the owner of two theatres, in the city of New Orleans, over which she had the personal care and superintendence; and having subsequently leased them, she removed her residence to Pass Christian, Mississippi, on the shore of the Gulf of Mexico, where she had previously purchased a house; and, while still looking after business interests in New Orleans, she spent her time principally at her home on the Gulf shore.

Our learned brother of the lower court made the following observations on this subject, viz:

"It appears that she led a very active life during these years pre-" ceding her death. Aside from the trips made to the North in con-" nection with her business, she went once by rail to the Pacific coast," and having changed her mind after arriving there, she came almost " immediately back.

"Several years before her death, she purchased a schooner yacht " which she kept constantly in commission upon the coast of Pass " Christian, and upon which she spent a great deal of her time, day " and night, indulging in sailing and fishing expeditions in the ad-" jacent waters and to the neighboring islands and bays. She was, " also, in the habit of rowing and swimming, her favorite method of " entering the water being to plunge in head foremost.

"She went fishing in the bayou in the rear of Pass Christian, and " whether from rain or from standing in the water (while) fishing, " she would get wet, and she remained so with impunity. She worked " in her garden and about her house, and was known to have moved " trunks and other heavy objects, and generally to conduct herself as a " robust and healthy woman; and during these years, certainly for " four or five years before her death, she had little occasion for the " services of Dr. Pratt; though, no doubt, if she had, at any time, felt " herself seriously ill, he would have been called in consultation with " the attending physician, as was actually the case."

Our examination of the record, confirms the correctness of this statement.

And there are some additional examples furnished by the witnesses of the robustness and vigor of decedent's health during the years that preceded her death, and subsequent to the period of time to which the medical witness confined his testimony.

On one occasion she made a trip on her pleasure schooner to a place called the "Keys", which is situated in the open gulf beyond the Mis-

sissippi Sound, and while fishing, waded out in the surf, and shared
the sport with her male companions.   On another occasion, she sailed
her own yacht in a regatta.   She repeatedly rode on horseback, and
rowed a skiff.

It appears that the decedent often engaged in such sports in the
mere pursuit of pleasure, and endured hardships such as were calcu-
lated to tax the constitution of the hardiest male; and to all appear-
ances, without sustaining the slightest apparent inconvenience or dis-
tress, or causing any trouble with her heart.

It is a conspicuous fact, that all the witnesses who testified with
reference to the decedent's complaint of heart trouble, affirm that she
was in apparent good health, and that they gained their knowledge of
her situation from her own statements, exclusively.

Aside from the testimony of the plaintiffs' medical witness relating
the result of his examination of the decedent's heart on a single occa-
sion in 1892, there is nothing in the evidence to show "the *character*
of this pre-existing heart complaint."

The testimony shows, that the decedent was taken ill on the 17th of
March, 1897, and a physician who resided at Pass Christian, Missis-
sippi, was summoned, and that she died at her residence in that town
on the 16th of May, following; and that subsequently to her death he
prepared and signed a death certificate to be used by the undertaker in
conveying her remains to New Orleans for interment, in which he
stated the cause of her death as "phlebitis and heart disease."

As a witness the physician stated that he attended the deceased pro-
fessionally during the intervening period of two months, and that the
cause of her death was phlebitis and endocarditis—the disease having
been the extension of the phlebitis to the heart.

He thus explains the term "heart disease" which he employed in the
death certificate.   That phlebitis is an inflammation of the veins, and
endocarditis is an inflammation of the lining membrane of the heart.
That, *primarily,* phlebitis has nothing to do with the heart, but by an
extension of the inflammation through the veins to the heart, an in-
flammation of the heart is produced, and that is denominated endo-
carditis.

From this explanation of the death certificate it appears, that the
heart disease mentioned in the certificate, was not intended to repre-
sent the pre-existing chronic valvular trouble of the decedent, which
the plaintiffs' medical witness describes, but the endocarditis which the

attending physician states to have resulted from the phlebitis with which she was first attacked, and which was, in his opinion, the cause of her death.

That interpretation, it would seem, might fairly be given to the phrase "phlebitis and heart disease", thus indicating phlebitis as the primary cause, and heart disease as the result or secondary cause of death.

He says the patient was first attacked with the grippe, and he was called to treat that complaint. That, after three or four days of illness, she left her bed and went about the house, and subsequently relapsed; and some days subsequent to the relapse, phlebitis set in. That this may have been a week or ten days after the relapse. That the heart disease or resulting endocarditis, which was the *final* cause of death, continued five or six days; but the witness states and emphasizes the statement, "that the disease she died of was due entirely to phlebitis."

The description given by the witness, of the disease of which the decedent died, and of the course it pursued, may be thus summarized:

The phlebitis first appeared in the patient's left foot and then extended up the left leg to the pelvic cavity. It next appeared in the right foot and extended up that leg. It went, next, to the lungs, and œdema of the lungs resulted.

It next appeared in the right arm and extended up that arm into the jugular vein, and through that vein into the heart.

That was the commencement of the endocarditis of which she died.

The witness positively asserts that the decedent did not die of *organic* heart disease, but of "acute heart disease." That he made a careful examination of her heart with a stethoscope, several days previous to her death and subsequent to the development of phlebitis, and thus made the discovery that her heart had become affected; but that the patient never complained of any heart trouble during her sickness.

He never had occasion to make an examination of the decedent's heart prior to the date of his having been called to attend her as he has described; but that, at the suggestion of Dr. Pratt, he did, on one occasion, some time previously, make a casual examination of her heart, but without the use of an instrument, and was unable to formulate any opinion on the subject, and did not express any at that time.

He expressed the opinion that a pre-existing heart trouble is not, necessarily, a predisposing cause for the development of phlebitis, nor does it prevent the development of that disease.

That "no previous heart trouble had anything to do with the pa-"tient's death, but that it was entirely an acute trouble, and caused "by a relapse of the grippe." That he traced the phlebitis from the etremities directly to the heart; that "he could almost see it moving with the eye—the extension of the inflammation."

The only positive testimony that the record discloses, that tends in the slightest degree to weaken the force of that of the attending physician, is that of the plaintiffs' medical witness whose evidence has been referred to, and which is, necessarily, hypothetical and conjectural, in part. Having been shown the various prescriptions that were made by the attending physician during the course of the decedent's illness, the witness gave it as his opinion, upon having made an examintaion of them, that many of the items of physic prescribed were such as would have a tendency to support the heart; that many of them related to heart trouble and not to inflammation. He then specified many of the ingredients as having a tendency to support the heart—the purpose of this testimony evidently being to show that the attending physician had, in fact, prescribed remedies for a chronic heart affection, in opposition to his evidence to the contrary.

Upon making an examination of the prescriptions, we find on the first one, which bears the number 16,433, and the date March 17th, 1897, when the attending physician was first called to see the deceased, tincture of lobelia, alone; and the witness states that same is usually prescribed for spasms, or spasmodic attacks.

On the second one, which bears the number 16,453, and the date March 20th, 1897, are calomel titrates, which he says is a medicine used for the liver.

On the third one, which bears the number 16,482, and date March 25th, 1897, are found quinine salacyl, lactophine and cactina pellets, which the witness says were for the support of the heart, and pneuralgic pains through the muscles, and also, to counteract uric acid.

Those of March 27th, 29th and 30th, 1897, showed repetitions of the foregoing ingredients.

But those of April 5th, 1897—bearing the numbers 16,567 and 16,-569—for the first time make mention of nitro-glycerine tablets, and tincture of iodine—the former for internal use, one every six hours,

and the latter for external application as directed—and the witness admits "that the tincture of iodine and glycerine were intended as a local application for phlebitis or erysipelas, or inflammation—to overcome inflammation."

These several prescriptions relate to the first fourteen days of the decedent's sickness; and it is manifest that on the last named date, the 5th of April, 1897, the disease of the patient took a decidedly unfavorable turn, inasmuch as the attending physician made a radical change in his treatment on that date, and had occasion, for the first time, to call *twice on the same day,* whereas his previous visits had been made only once in three days.

Subsequently, he prescribed for her, on the 7th of April, twice; on the 8th, once; on the 10th, twice; and on the 12th, twice—all of the prescriptions of those dates having been practically a repetition of those of the 5th.

On the 20th he prescribed twice; on the 27th twice; and on the 10th of May he prescribed for the last time—only a day or two preceding the patient's death.

Instead of supporting the theory announced by the plaintiffs' medical witness, the proof furnished by the prescriptions, most circumstantially corroborate the theory and evidence of the attending physician, to the effect that the preliminary attack of the testatrix was one of grippe, and was not by him considered or treated as a serious or dangerous case; but when the phlebitis first manifested itself, on the 5th of April—judging from the *character* of his two prescriptions of that date—some days subsequent to her relapse from the grippe, his anxiety was evidently aroused at once, and a change made in her treatment; and same was, thereafter, unremittingly continued to the time of her death.

There is nothing apparent from an examination of the prescriptions, indicating that the attending physician treated the deceased for a chronic heart trouble, and the plaintiffs' medical witness fails to disclose that such was the case, judging from the uses and purposes to which the physic prescribed is ordinarily applied.

That witness frankly admitted that, in the course of his practice, he had never treated a case of phlebitis, and, consequently, could not give anything other than technical information in regard to it; and the attending physician was not questioned in reference to the prescriptions, or the objects he sought to accomplish by their administration.

Hence, our investigation of this part of the case, has thrown but little additional light upon the question at issue.

But, outside of the domain of fact with regard to the disease decedent was treated for, and of which the attending physician believed she died, the question still unsolved, and to which we must devote attention is, whether phlebitis is an independent disease, capable of producing death, or is a disease propagated or stimulated by some other disease from which death ensues as a predisposing cause. For if phlebitis is not an independent disease, but one that is produced by some other predisposing cause, then great weight and importance must necessarily attach to the testimony in reference to the decedent's chronic heart trouble, as she undoubtedly died of heart disease, either acute or chronic.

And the determination of that question must, of necessity, depend upon the opinions of medical scientists, whose experience and learning, justly entitle same to exceptional consideration.

On the trial there were interrogated, four of the most celebrated and widely known medical men of the city of New Orleans, who expressed their opinions on the issue involved, and we have briefly analyzed their testimony.

One of these stated, that anything that may excite inflammation of a vein may develop phlebitis; but there are other causes, such as infectious diseases, or micro-organisms, and toxic agents, such as gout or rheumatism.

The following interrogatory and response are quite pertinent, viz:—

"Q.—Is phlebitis dependent for its origin upon any pre-existing heart trouble, or heart disease?

"A.—Not at all necessary; not at all necessary, by any means. It is an independent affliction. I mean to say not at all associated with it."

His statement is, that phlebitis is confined to the venous system through which the blood flows constantly *to* the heart, and is not found in the arterial system through which the blood flows constantly *from* the heart. "So that in thrombus and phlebitis, any detached clots would be carried by that venous current in the direction of the heart—towards the heart."

He explained the great variety of ways in which phlebitis produces death, and said:

"So we have a great many causes of death from phlebitis."

When the phlebitis, or inflammation of the veins extends into the heart, it is called endocarditis—but it is merely an extension of the inflammation, of the same inflammation from the veins into the heart. That phlebitis is an inflammation of the lining membrane of the veins, and endocarditis is an inflammation of the lining membranes of the heart.

It is manifest that his statements are in exact accord with the opinion expressed by the attending physician of the deceased.

The following extract from the testimony of another of the medical experts, is much to the same effect, viz:

"Q.—What is the cause of phlebitis? Does it result from heart disease, or anything of that kind, fundamental, or otherwise?

"A.—I would say that I look upon phlebitis generally, as caused in ninety-nine out of a hundred cases, by living organisms. That must be one of the chief causes."

He positively affirms, that during the course of a practice of thirty years, he "can not recollect any case in which phlebitis was caused by heart disease."

Another of the experts expresses the opinion, after enumerating many of the causes which produce phlebitis, that it is "sometimes " brought about by chronic heart trouble—the sluggishness of the " circulation; the circulation gets so sluggish from the chronic heart ." trouble, that the veins dilate, and then there seems to be a lowering " of the whole system that appears to be *a* cause of phlebitis."

The fourth expert puts the proposition thus: that an organic lesion of the heart would affect the character and duration of phlebitis, and tend to aggravate it; and in case of death, he was of opinion, that "the heart trouble has somewhat contributed to it."

It thus appears that all of the experts agree, that phlebitis is an *independent disease;* two of them affirm that it is not at all associated with chronic heart disease; one of them, that it is sometimes brought about by chronic heart trouble and resulting sluggishness of the circulation; and the fourth that an organic heart trouble would affect the *character and duration of phlebitis and tend to aggravate it.*

The substance and purport of this expert testimony supports the opinion of the attending physician in every material respect, and affirms the correctness of his diagnosis of the decedent's disease, and of the treatment he prescribed.

One of the experts made the statement that there is what is termed an idiopathic form of phlebitis, the cause of which cannot be easily recognized; and that there is another type known as metastatic phlebitis, in which an inflammation of the veins occurs "all at once;" that is to say, it jumps from one part of the person to another part. That it acts somewhat on the principle of rheumatism, that is to say an inflammation will appear in one knee joint, and "all at once it goes over to the elbow joint."

By making a comparison of this peculiarity of phlebitis, with the description given by the attending physician of the disease with which the decedent was afflicted, we find a striking parallel between them; and this fact inclines us to the opinion that it proceeded in this way rather than by having "spread by continuity of surface."

But the testimony of plaintiffs' medical witness is to the effect that the valves of the decedent's heart did not open and close properly; that is to say, "the doors of the ventricle of the heart—the valves of the heart on the left side of the heart"—did not open and close properly.

By this is meant, that the arterial, or mitral valve on the left side of the heart; the "auricular ventrical valve, on the left side of the heart", did not properly perform its legitimate functions, for the reason that they did not open and close properly.

That this was the result of an examination he made of the deceased in 1892, and that he found her heart in a similar situation when he made a second examination, about two years afterward.

Accepting his theory as correct, it does not seem possible to discover any connection between the chronic, valvular trouble of the decedent's left heart in 1892, and 1894, and the acute endocarditis of which she died in 1897.

This medical witness does not state that this valvular heart trouble was accompanied by any inflammation of the lining membranes of her heart, and it could not, consequently, have actively assisted in producing the endocarditis of which she died; yet it might have been possible for the action of the valves of her heart to have been stimulated by the administration of nitro-glycerine as a means of giving it immediate relief from the excess of blood it contained, by its explosive force.

And this suggestion finds sanction in the prescriptions of the attending physician, at the particular stage of the sickness of the de-

ceased when phlebitis *first* made its appearance, possibly as a prepara-tory or initial measure of protection, he not then being able to foresee the ultimate result.

A careful review and analysis of. the evidence have brought us to the conclusion (1) that phlebitis is an independent disease capable of producing death; (2) that while heart disease may be, in a remote de-gree, a predisposing cause of phlebitis, its only effect relates to the character and duration of the disease which is superinduced by some other cause; (3) that the chronic valvular heart trouble of the de-ceased did not produce the phlebitis of which she died, or affect its character or duration appreciably; (4) that the decedent's death in May, 1897, was immediately and directly caused by phlebitis which ensued, or was the sequel of *la grippe,* with which she was first afflicted in March, 1897; (5) and that, consequently, the chronic heart disease of which she had complained for many years previous to her death, was not the sickness of which she died, and hence the claims of the plaintiffs are not well founded.

This was the conclusion at which our learned brother of the lower court arrived, .and we concur in his appreciation of the evidence.

Judgment affirmed.

MONROE, J., recused.

Rehearing refused.